UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | |
| | * | |
| FNU LNU #2, | * | |
| A/K/A "JOSUE GOMES MOLINA," | * | Criminal Action No. 1:19-cr-10439-IT-4 |
| A/K/A "JOSE LUIS CARMONA- | * | |
| GERMAN," | * | |
| | * | |
| Defendant. | * | |
| | * | |

MEMORANDUM & ORDER

August 14, 2026

TALWANI, D.J.

Defendant FNU LNU #2, a/k/a "Josue Gomes Molina," a/k/a "Jose Luis Carmona-German," was charged with conspiring to distribute more than 400 grams of fentanyl in violation of 21 U.S.C. §§ 846 and 841(a)(1) and with possessing with intent to distribute more than 400 grams of fentanyl in violation of 21 U.S.C. § 841(b)(1)(A). Indictment, Counts 1, 6 [Doc. No. 1]. Pending before the court is Defendant's Motion to Suppress [Doc. No. 442]. For the reasons explained below, the motion is DENIED.

## I. Background

### A. *DEA Investigation*

In March 2018, the Drug Enforcement Agency ("DEA") began an investigation into a suspected drug trafficking organization. Montagano Aff. ISO Appl. for Search Warrant ("Montagano Aff.") ¶ 8 [Doc. No. 442-1]. Between March and June 2018, an undercover officer made multiple controlled purchases of fentanyl from several individuals. Id. at ¶¶ 8–12. Through these purchases and surveillance of the sellers, law enforcement was able to connect other people, cars, and locations, including 17 Avila Road in Boston, Massachusetts, to the organization. Id. Law

enforcement monitored 17 Avila Road with a pole camera, which led to multiple drug seizures. Id. at ¶ 8. On January 17, 2019, the DEA obtained telephone records confirming that an individual identified as Josue Gomez Molina[1] was in contact with individuals operating out of the house at 17 Avila Road. Gov.'s Opp'n, Ex. 1 at 2 [Doc. No. 446-1] ("March 4, 2019 DEA Rep."). Additionally, the DEA obtained information that the individuals operating out of 17 Avila Road in Boston had started using a "stash" house located 89 Oesting Street, New Bedford, Massachusetts. Id.

B. *Surveillance of Defendant Travelling from Boston to North Providence*

On March 19, 2019, at or around 10:30 a.m., DEA investigators monitoring the pole camera at 17 Avila Road observed Defendant exit the home with a backpack, lock the door, and enter the rear of a black Nissan Altima. Def.'s Mot. Ex. B. at 1 [Doc. No. 442-2] ("March 19, 2019 DEA Rep."). DEA investigators followed the car until it stopped in the area of 17 Thurber Road in North Providence, Rhode Island, at or around 11:14 a.m. Id. Investigators observed Defendant, with backpack on, meeting with an unidentified individual at 17 Thurber Road. Id. At or around 11:22 a.m., investigators observed a blue Chevrolet[2] stop near the home and, a couple minutes later, Defendant, with the backpack, exit the home and enter the rear passenger seat of the blue Chevrolet. Id. at 1–2.

Investigators observed that vehicle leave North Providence and travel in the direction of New Bedford, Massachusetts. Id. at 2. DEA agents continued to survey the vehicle as it crossed into Massachusetts. Id.

---

[1] According to the report, Josue Gomez Molina provided a Puerto Rican driver's license with a birthdate of May 23, 1989. March 4, 2019 DEA Rep. at 2 [Doc. No. 446-1].

[2] While DEA records refer to the vehicle as a blue Chevrolet Impala, the Massachusetts state police arrest report describes the vehicle as a blue Chevrolet Malibu. Compare March 19, 2019 DEA Rep. 1 [Doc. No. 442-2] with Arrest Rep. 1 [Doc. No. 442-4]. Where all records describe the car as having a license plate with a Rhode Island registration, WL108, and the parties do not raise the dispute, the court understands the DEA investigators and the Massachusetts state police to refer to the same vehicle.

C. *Stop and Arrest*

DEA agents coordinated a traffic stop of the vehicle with the Massachusetts state police. Id. At around 1 p.m., Massachusetts state police Sergeant Gregory Keane initiated a traffic stop after observing the blue Chevrolet veer from the right lane into the left lane several times while travelling eastbound on Route 195, near Dartmouth, Massachusetts. Def.'s Mot. Ex. D at 2 [Doc. No. 442-4] ("Arrest Rep."). Sergeant Keane approached the passenger side of the vehicle and observed Defendant, the sole passenger, sitting in the right rear with seatbelt unbuckled and accompanied by a backpack. Id. Sergeant Keane obtained the license and registration of the driver, who stated that he worked for Uber. Id. After noting that the car lacked any markings or displays associated with Uber, Sergeant Keane asked for confirmation of the driver's relationship with the rideshare company, but the driver was unable to provide any documentation. Id.

Sergeant Keane asked Defendant for identification and asked why he was not wearing a seatbelt. Id. The driver told Sergeant Keane that Defendant did not speak English. Id. Defendant provided an International License in the name of Josue Gomes Medina, issued on March 5, 2019, listing a birthplace of the Dominican Republic, a birthdate of May 23, 1989, a home address of 15 Avila Road, Boston, Massachusetts, and a height of 5' 06". Id.; Def.'s Mot. to Suppress Ex. E [Doc. No. 442-5]. Sergeant Keane processed the driver and Defendant's information through dispatch. Id. Defendant's information did not return a match. Arrest Rep. 2 [Doc. No. 442-4]. Sergeant Keane then asked the driver if Defendant had alternative identification. Id. Defendant produced a Puerto Rico driver's license, with the same name and date of birth and listing a weight of 180 pounds. Id.; Def.'s Mot. to Suppress Ex. E [Doc. No. 442-5]. Dispatch was unable to match anyone to the Puerto Rico license. Arrest Rep. 2 [Doc. No. 442-4].

Sergeant Keane, when checking Defendant's two forms of identification, came across the record of an individual with the name, "Josue Molina," a May 8, 1984 birthdate, height 5' 6",

weight 180 pounds, a home address of East Boston, and an outstanding arrest warrant for child pornography charges. Id. at 3. Sergeant Keane and the other two officers who had joined him at the traffic stop agreed that the photograph of Mr. Molina of East Boston resembled Defendant. Id. Sergeant Keane reported that he "believed [Defendant] to be using false identification to conceal his true identity of [Mr. Molina of East Boston.]" Id. Sergeant Keane reported that he showed Defendant the photograph of Mr. Molina of East Boston and Defendant lowered his face in a "defeated" manner. Sergeant Keane perceived Defendant's reaction as an admission and arrested Defendant based on the outstanding warrant for Mr. Molina of East Boston. Id. Troopers Roper and Soares transported Defendant to the police station in Dartmouth, Massachusetts. Id. Trooper Berlo opened the backpack and found a large amount of narcotics, later identified as over 1 kilogram of heroin and fentanyl, hidden in the bottom of the backpack. Id.

At the police station, after running Defendant's fingerprints and facial recognition software and finding no match, Sergeant Keane concluded that he had misidentified Defendant as Mr. Molina from East Boston. Id. at 3. During the booking process, after Defendant spoke with his attorney, Defendant identified himself with a different name, "Josue Carmona German," a May 23 birthday (consistent with the May 23 date in the Puerto Rican and International Driver's licenses), but a new birthyear of 1986 (rather than the year 1989 set forth in those documents). Id. at 4. At the time of the arrest, Defendant's height was recorded as 5' 4" and weight as 175 pounds, rather than the 5' 6" and 180 pounds set forth in the Puerto Rican and International Driver's licenses. Id. at 1; Def.'s Mot. to Suppress Ex. E [Doc. No. 442-5].

After posting bail, Defendant failed to attend his arraignment in New Bedford District Court. March 19, 2019 DEA Rep. 2 [Doc. No. 442-2]. Federal charges were brought against Defendant in a Sealed Indictment [Doc. No. 1] on November 13, 2019. Almost six years later, on

October 20, 2025, Defendant was arrested in Rhode Island and arraigned on Counts 1 and 6 of the Indictment [Doc. No. 1]. See Elec. Clerk's Notes [Doc. No. 415].

## II. Legal Standard

The Fourth Amendment guarantees the right to be free from "unreasonable searches and seizures." U.S. Const. amend. IV. "A temporary detention of an individual during a traffic stop by police constitutes a seizure to which the protections of the Fourth Amendment apply." United States v. Cruz-Rivera, 14 F.4th 32, 43 (1st Cir. 2021). "An officer can stop a car if he sees a driver commit a traffic offense, even if the stop is just an excuse to investigate something else." United States v. McGregor, 650 F.3d 813, 820 (1st Cir. 2011) (citing Whren v. United States, 517 U.S. 806, 810 (1996)). A warrantless traffic stop must "not be 'unreasonable' under the circumstances." Whren, 517 U.S. at 810. "[T]he decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." Id. (citing Delaware v. Prouse, 440 U.S. 648, 659 (1979)). A traffic stop is intended to "address the traffic violation that warranted the stop and attend to related safety concerns" and may include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." Rodriguez v. United States, 575 U.S. 348, 354–55 (2015) (internal citations and quotations omitted). "These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." Id. at 355. "However, such a stop can be extended where there is reasonable suspicion of further criminal wrongdoing." Cruz-Rivera, 14 F.4th at 43 (citing United States v. Lee, 317 F.3d 26, 33 (1st Cir. 2003)).

There is no "simple, mechanical formula" for determining what reasonable suspicion is, but "it is less than probable cause and more than a naked hunch . . . [and] courts must gauge its presence in a commonsense, case-by-case way, taking in the whole picture." Id. (quoting McGregor, 650

F.3d at 821). "[T]he reasonableness 'determination . . . entails a measurable degree of deference to the perceptions of experienced law enforcement officers,'" id. at 43–44 (quoting United States v. Ruidíaz, 529 F.3d 25, 29 (1st Cir. 2008)), and is based on the "totality of the circumstances," Florida v. Harris, 568 U.S. 237, 244 (2013).

"[S]earches conducted outside the judicial process, without prior approval by judge or magistrate are per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967). Two such exceptions are searches-incident-to-arrest, justified by concerns for officer safety and evidence preservation, and searches of automobiles where police have probable cause to believe that the automobile contains contraband. See Arizona v. Gant, 556 U.S. 332, 338 (2009).

Police have probable cause to search "where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." Ornelas v. United States, 517 U.S. 690, 696 (1996). "Probable cause exists when the facts and circumstances as to which police have reasonably trustworthy information are sufficient to warrant a person of reasonable caution in the belief that evidence of a crime will be found." United States v. Silva, 742 F.3d 1, 7 (1st Cir. 2014) (internal citation omitted). To assess whether probable cause exists, a court may "look to the collective information known to the law enforcement officers participating in the investigation rather than isolat[ing] the information known by the individual [acting] officer." United States v. Balser, 70 F.4th 613, 619 (1st Cir. 2023) (quoting United States v. Azor, 881 F.3d 1, 8 (1st Cir. 2017)); see United States v. Meade, 110 F.3d 190, 193 (1st Cir. 1997)).

## III. Discussion

Defendant argues that the evidence seized on March 19, 2019, should be suppressed because (1) the Massachusetts state police did not have reasonable suspicion to prolong the stop beyond

issuing a traffic citation; (2) the mistaken identity arrest was unreasonable; and (3) the search of Defendant's backpack incident to his arrest was illegal. Def.'s Mot. to Suppress [Doc. No. 442]. The government argues the stop was justified as a traffic stop and, based on the collective knowledge doctrine, the arrest and search were justified by probable cause. Gov.'s Opp'n [Doc. No. 446].

A. *Stop*

Defendant does not dispute that the traffic stop of the blue Chevrolet was warranted in light of Sergeant Keane's observation of several marked lane violations. Def.'s Mot. to Suppress 4 [Doc. No. 442]. Rather, Defendant argues that Sergeant Keane lacked reasonable suspicion to suspect Defendant, a passenger, of any wrongdoing. Id. However, Sergeant Keane knew from DEA investigators that Defendant had left a known stash house of a drug trafficking organization in Boston and was travelling in the direction of a new stash house of the same organization in New Bedford. March 19, 2019 DEA Rep. 2 [Doc. No. 442-2]. That information, collectively acquired,[3] comprised reasonable suspicion justifying Sergeant Keane's request for Defendant's identification following the lawful traffic stop. See Meade, 110 F.3d at 193.

Further, while police authority to seize an individual ends "when tasks tied to the traffic infraction are—or reasonably should have been—completed," Rodriguez v. United States, 575 U.S. 348, 354 (2015), in addition to "determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop.'" Id. at 355 (quoting Illinois v.

[3] Defendant argues that the DEA investigators' information cannot be imputed to Sergeant Keane because neither the DEA nor Massachusetts state police had probable cause to believe that Defendant was specifically involved with drug trafficking. Def.'s Mot. to Suppress 10–12 [Doc. No. 442]. However, Defendant offers no support for his curious distinction that collective knowledge may only be relied upon when the information amounts to probable cause, as opposed to reasonable suspicion. Id. First Circuit caselaw makes clear that police can rely on information from other law enforcement agents when developing conclusions that amount to either reasonable suspicion or probable cause. See Balser, 70 F.4th at 620 (discussing cases involving both determinations).

Caballes, 543 U.S. 405, 408 (2005)). Here, after pulling the blue Chevrolet over for a suspected traffic violation and immediately observing that Defendant was not wearing a seatbelt, Sergeant Keane asked both driver and Defendant for their identification. Arrest Rep. 2 [Doc. No. 442-4]. Sergeant Keane noted that Defendant's International License had been issued a mere two weeks prior to the stop and included a home address directly adjacent to the known stash house in Boston. Id. Accordingly, Sergeant Keane knew that (1) the DEA observed Defendant travel from the stash house of a drug trafficking organization in the direction of another known stash house; (2) the driver of the blue Chevrolet asserted he drove for Uber but the car was unmarked and the driver was unable to provide verifying information; (3) Defendant's International License was recently issued and evinced a further connection to the drug trafficking organization; and (4) that License was likely inauthentic. Id.; March 19, 2019 DEA Rep. 2 [Doc. No. 442-2]. These observations provided Sergeant Keane with "reasonable suspicion of wrongdoing" supporting his request for another form of identification. Lee, 317 F.3d at 31.

When Defendant provided the Puerto Rico driver's license, Sergeant Keane was also unable to verify that information, increasing his suspicion that Defendant was using false identification. Arrest Rep. 2–3 [Doc. No. 442-4]. Accordingly, the initial stop was lawful and the police had reasonable suspicion based on their collective knowledge and direct observations to prolong the stop and request Defendant's identification.[4]

---

[4] Defendant argues that the police were not permitted to require that he produce identification during the traffic stop. Def.'s Mem. 5–6 [Doc. No. 442]. However, the police had reasonable suspicion of Defendant's criminal activity based on DEA investigator's observation of Defendant in association with the known drug trafficking organization operating out of 17 Avila Road in Boston. Balser, 70 F.4th at 620.

B. *Arrest*

Defendant argues that it was unreasonable for Sergeant Keane to mistake Defendant for Mr. Molina of East Boston and arrest him based on Mr. Molina's outstanding warrant due to lack of physical resemblance. Def.'s Mot. to Suppress 6–8 [Doc. No. 442]. In particular, Defendant compares a "visible facial scar above his left eye" with the lack of a similar distinguishing facial features in Mr. Molina's photograph. Id. at 3. Having reviewed the booking photograph of Defendant and the photograph of Mr. Molina, the court finds that it was not unreasonable for Sergeant Keane to mistake Defendant for Mr. Molina. First, both individuals are of similar complexion ("medium"), and ages (born in 1986 and 1984, respectively), and both share dark eyes, hair, and similar facial hair. Arrest Rep. 1 [Doc. No. 442-4]; Def.'s Mot. to Suppress Ex. F [Doc. No. 442-6]; Def.'s Mot. to Suppress Ex. G [Doc. No. 442-7]. While Defendant's height (5' 4") and weight (175 pounds) as set forth in the arrest report differ slightly from Mr. Molina's height (5'6") and weight (180 pounds), the height and weight on Defendant's proffered identification was the same as for Mr. Molina. Arrest Rep. 1 [Doc. No. 442-4]; Def.'s Mot. to Suppress Ex. E [Doc. No. 442-5]; Def.'s Mot. to Suppress Ex. G [Doc. No. 442-7]. And the absence of a scar in Mr. Molina's photograph is not remarkable where the timing of when Defendant obtained the scar and when Mr. Molina's photo was taken were not before the officers. Second, when Sergeant Keane confronted Defendant with the photograph of Mr. Molina, Defendant did not protest and deny a connection. Arrest Rep. 3 [Doc. No. 442-4]. Instead, Defendant reportedly turned his head toward his chest and looked "defeated." Id. Third, it was reasonable for Sergeant Keane to believe that Defendant was concealing his identity, given that Defendant provided two inauthentic forms of identification. Id. Therefore, police's arrest of Defendant based on the outstanding warrant issued for Mr. Molina was in good faith and objectively reasonable. See Hill v. California, 401 U.S. 797, 803–04 (1971).

C. *Search*

Defendant argues that the police improperly searched his backpack as an incident to his arrest. Def.'s Mot. to Suppress 8–10 [Doc. No. 442]. The police searched the backpack after removing Defendant from the vehicle and pat frisking him. Arrest Rep. 3 [Doc. No. 442-4]. A search incident to arrest is justified to protect officer safety and preserve evidence. See United States v. Perez, 89 F.4th 247 (1st Cir. 2023), reh'g and reh'g en banc denied, 113 F.4th 137 (1st Cir. 2024), cert. denied, 145 S. Ct. 1469 (2025) (search of backpack the defendant was carrying which the police removed during handcuffing was lawful under the Fourth Amendment as a search incident to arrest even though arrestee was in handcuffs and unable to reach the pack); United States v. Eatherton, 519 F.2d 603 (1st Cir. 1975) (search of briefcase that the defendant dropped to the ground when he was arrested was reasonable under the search incident to arrest doctrine).

Defendant argues that the search was unlawful because the backpack was not within his immediate control at the time of arrest. Def.'s Mot. to Suppress 8–10 [Doc. No. 442]. However, the "'immediate area of control' rule does not apply to 'personal property . . . immediately associated with the person of the arrestee.'" Perez, 89 F.4th at 256 (quoting United States v. Chadwick, 433 U.S. 1, 15 (1977)). DEA investigators observed Defendant consistently carrying his backpack throughout the morning of March 19, 2019, as he travelled to multiple locations. March 19, 2019 DEA Rep. 2–3 [Doc. No. 442-2]. Because probable cause supports Defendant's arrest, the police were permitted to search his backpack incident to his arrest. Cf. United States v. Small, No. 2:25-cr-00003-NT, 2025 WL 2721042 (D. Me. Sep. 24, 2025) (denying motion to suppress evidence obtained from slingpack defendant had been observed wearing throughout the day and had been separated from defendant during arrest).[5]

[5] Even if not immediately present on Defendant's person, where the driver asserted that he was only the Uber driver, the backpack would have been transported to the Dartmouth police station alongside Defendant as his possession and would have been subject to a custodial inventory search

## IV. Conclusion

Accordingly, because the initial stop was permissible and, following the stop, the police developed reasonable suspicion of further wrongdoing sufficient to prolong the seizure, arrest Defendant, and search his backpack, there is no basis to suppress the evidence from the stop, arrest, and search. Defendant's Motion to Suppress [Doc. No. 442] is therefore DENIED.

IT IS SO ORDERED.

August 14, 2026

/s/ Indira Talwani
United States District Judge

---

there. See Gov.'s Opp'n Ex. 2 [Doc. No. 446-2] (Massachusetts State Police 2017 Custodial Inventory Policy); see also Illinois v. Lafayette, 462 U.S. 640, 646 (1983) ("[I]t is entirely proper for police to remove and list or inventory property found on the person or in the possession of an arrested person who is to be jailed."); United States v. Pardue, 385 F.3d 101, 105–06 (inevitable discovery doctrine applied to custodial inventory search of defendant's personal property required by police policy).